IN THE UNITED STATES DISTRICT COURTS
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHELE TRAMMEL
 o/b/o  M. T.                                                                    PLAINTIFF

        v.                              CIVIL NO. 07-2098

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                          DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Michel Trammel, brings this action on behalf of M. T., a minor child, seeking

judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social

Security Administration (Commissioner), denying M. T.'s application for child's supplemental

security income (SSI) benefits under Title XVI of the Social Security Act.

## I.  Background:

Plaintiff filed an application for SSI on M. T.'s behalf on November 13, 2003, alleging that

M. T. became disabled on May 31, 2004, due to cerebral palsy, scoliosis, attention deficit

hyperactivity disorder ("ADHD"), lead poisoning, digestive problems, learning disabilities, and

explosive personality disorder. (Tr. 56, 68).  An administrative hearing was held on July 18, 2006.

(Tr. 345-364).  Plaintiff was present and represented by council.  At the time, M. T. was 13 years old

and in the seventh grade.  (Tr. 348).

The Administrative Law Judge ("ALJ"), in a written decision dated January 20, 2007, found

that M. T.'s impairments were severe, but did not meet, medically equal, or functionally equal any

of the listed impairments. (Tr. 21).  He concluded that M. T. had marked limitations with regard to

acquiring and using information; less than marked limitations in the areas of attending and

completing tasks, interacting and relating with others, and moving and manipulating objects; and, no limitations affecting his ability to care for himself or health and physical well-being. (Tr. 19-20). As such, the ALJ determined that M. T. was not disabled. (Tr. 22).

On August 7, 2007, the Appeals Council declined to review this decision. (Tr. 5-8). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the matter is now ready for decision. (Doc. # 9, 10).

## II. **Applicable Law:**

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

2

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps.  This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments.  More specifically, a determination that a child is disabled requires the following three-step analysis.  *See* 20 C.F.R. § 416.924(a).  First, the ALJ must consider whether the child is engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.924(b).  If the child is so engaged, he or she will not be awarded SSI benefits.  *See id.*  Second, the ALJ must consider whether the child has a severe impairment.  *See* 20 C.F.R. § 416.924(c).  A severe impairment is an impairment that is more than a slight abnormality.  *See id.*  Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  *See* 20 C.F.R. § 416.924(c).  Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act.  *See* 20 C.F.R. § 416.924(d).  Under the third step, a child's impairment is medically equal to a listed impairment

3

if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3). The ALJ determined that the facts in this case suggest M. T. had marked limitations[1] with regard to acquiring and using information; less than

---

[1]We will find that you have a 'marked' limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

AO72A
(Rev. 8/82)

marked limitations in the areas of attending and completing tasks, interacting and relating with others, and moving and manipulating objects; and, no limitations affecting his ability to care for himself or health and physical well-being.

### III.   Discussion:

The medical evidence of record indicates that M. T. suffers from cerebral palsy, scoliosis, attention deficit hyperactivity disorder ("ADHD"), digestive problems, learning disabilities, and explosive personality disorder.  Records show that M. T. had significant problems with anger management, impulsivity, judgment, and social behavior.

In March 2004, Ms. Linda Lyle, M. T.'s 4th grade teacher, completed a school questionnaire. (Tr. 121-122).  She noted that M. T. socialized with troublemakers, experienced problems completing assignments on time, lied, experienced temper outbursts, had problems with self-confidence, exhibited childish/immature behavior.  Ms. Lyle indicated that these behaviors posed a serious detriment to M. T.'s school success.  She also noted that certain problems noticeably interfered with his academic or social progress, including:  1) problems making or keeping friends; 2) problems concentrating on class work; 3) problems working independently or staying on task; 4) problems concentrating on things of interest to him; 5) talking out of turn/interrupts; 6) problems learning from mistakes; and 7) aggressiveness/fights.  (Tr. 121-122).

In May 2004, M. T. sought treatment from Dr. William Meany, a psychiatrist, concerning his anger management problems.  (Tr. 198, 200, 264).  Records indicate that M. T. would bang his head, hit himself, scream, pull his hair, and threaten to kill himself or others when angry.  He also frequently lied.  M. T.'s medications included Zoloft, Strattera, and Miralax.  Physically, he had

---

20 C.F. R. § 416.926a(e).

some paralysis in his left arm and hand, as well as problems with his left calf.  Dr. Meany diagnosed

explosive disorder, organic personality traits, and mental retardation.  He prescribed Depakote in

addition to M. T.'s other medications.  (Tr. 200, 264).

On October 26, 2004, M. T. had a follow-up with Dr. Meany.  (Tr. 199, 209).  The doctor

noted that M. T. tried to choke himself when he was angry with his brother.  He also grew frustrated

with his limited coordination and sometimes ran off and wandered along the highway.  The doctor

diagnosed explosive disorder, unpredictable, poor frustration tolerance; organic personality disorder;

and, cerebral palsy.  (Tr. 199, 209).

When M. T. was in 5th grade, a school questionnaire was completed which rated M. T.'s

abilities in the areas of communication; social functioning; concentration, persistence, and pace; and,

behavioral function.  (Tr. 109-110).  The following were noted to noticeably interfere with his

academic or social progress:   1) problems making or keeping friends; 2) socializing with

troublemakers; 3) problems concentrating on class work; 4) problems working independently or

staying on task; 5) problems concentrating on things of interest to the student; 6) problems

completing assignments on time; 7) talking out of turn/interrupts; 8) temper outbursts; 9)

defiant/disobedient behavior; 10) aggression/fights; and, 11) problems with self-confidence.  (Tr.

109-110).

On February 7, 2005, Dr. Ron Beckel, plaintiff's treating doctor, completed a physician's

report for school.  (Tr. 202). He indicated that M. T. needed modified physical education and had

difficulty completing his work, would not stay in his seat for very long, exhibited impulsive behavior

that interfered with socialization, and was disorganized in his work activities.  (Tr. 202).

6

On August 25, 2005, Living Hope evaluated M. T. and determined that he was experiencing problems related to angry aggressive outbursts, impulse with poor judgment, anxiety and sadness, poor attention, poor concentration, hyperactivity, and poor social skills. (Tr. 292-294). His symptoms included aggressiveness, self care risk, anxiety/panic, depressed mood, impulsiveness, stealing, verbal aggression, decreased concentration, distractibility, hyperactivity, and poor judgment. (Tr. 314-315). He was diagnosed with oppositional disorder and a developmental reading disorder, and assessed with a GAF of 55. (Tr. 293, 312).

On March 1, 2006, Dr. Meany saw M. T. again. (Tr. 261-263). He continued to experience anger management problems, and was very unhappy. M. T. stated that he was being taunted at school, which resulted in a loss of control and involvement in fights. His limited communication skills led to outbursts with a risk of danger to others. He also had problems with lying and projecting the blame for his behavior. M. T. felt other people were in control of his blow-ups, and he was socially and emotionally limited. Dr. Meaney noted no improvement with the Risperdal, and diagnosed him with explosive disorder, organic personality disorder, mental retardation, cerebral palsy, encopresis, and a physical disability. (Tr. 262). Dr. Meany ordered laboratory tests to check his Valporate level, and then prescribed Depakote and Abilify. (Tr. 263).

In October 2006, when M. T. was in 7th grade, his resource teacher as well as the school nurse completed a teacher questionnaire. (Tr. 165-169). They indicated that he had very serious problems understanding school and content vocabulary, reading and comprehending written material, comprehending and solving math problems, expressing ideas in written form, learning new material, recalling and applying previously learned material, completing class/homework assignments, and handling frustration appropriately. M. T. also had serious problems providing organized oral

explanations and adequate descriptions, applying problem-solving skills in class discussions, focusing long enough to finish an assigned activity or task, completing work accurately without mistakes, working at a reasonable pace/finishing on time, expressing anger appropriately identifying and asserting emotional needs, and using appropriate coping skills to meet daily demands of school environment.  He was also noted to have obvious problems in several areas of moving about and manipulating objects due to his back and limited use of his left arm. (Tr. 168).

Testimony at the hearing revealed that days earlier, M. T. had been involved in an argument with his brother and had gone into the kitchen and grabbed a knife.  (Tr. 352).  In fact, he had also been recently suspended from school due to fighting.  (Tr. 362).  Plaintiff testified that M. T.'s chronic pain, associated with the scoliosis, caused him get angry much quicker than normal.  (Tr. 352-353).

In spite of this evidence, however, the ALJ determined that M. T. had less than marked limitations in the area of interacting and relating to others and attending and completing tasks, and no limitations with regard to self care.  While we cannot say exactly what level of limitation M. T. suffers from, as that is a medical question, we do believe that, based on the aforementioned evidence, the ALJ should have contacted M. T.'s treating doctor(s) to clarify his level of impairment.  We note that the only RFC's contained in the record were completed my non-examining, consultative examiners who merely reviewed M. T.'s medical records. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (holding that duty to develop the record includes duty to seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped); *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who examined

AO72A
(Rev. 8/82)

the plaintiff once or not at all does not generally constitute substantial evidence). Accordingly, this case will be remanded to allow the ALJ to obtain RFC assessments from M. T.'s treating doctors.

The ALJ also concluded that M. T. had less than marked limitations in the area of moving about and manipulating objects. While we note that M. T. was able to perform many activities, in spite of the fact that cerebral palsy has left him with limited use of his left side, the record also indicates that he was not able to participate in these activities on the same level as other children his age. (Tr. 218-219, 233-234, 349). M. T. did state that he enjoyed playing football and basketball. However, the record indicates that he was not able to do so on a competitive level and was not able to participate for extended periods of time. (Tr. 352, 354, 361-362). It was also noted that M. T. was often dragging his left leg by the end of the school day. As such, we believe that the ALJ placed too much reliance on the fact that M. T. indicated that he enjoyed participating in these activities, and failed to properly consider his actual level of participation in those activities. Therefore, on remand, the ALJ should also reevaluate M. T.'s level of impairment in this area of functioning.

## IV. Conclusion:

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence, and therefore, recommend that the denial of benefits to M. T. be reversed and this matter remanded to the Commissioner for further consideration pursuant to sentence six of 42 U.S.C. § 405(g).

DATED this 17th day of June 2008.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

9

AO72A
(Rev. 8/82)